and the Maracos. Mr. McLaughlin, on behalf of defendant appellant Mirchao Constantinescu, as the court understands from the briefing, our position is that Mirchao's sentence was substantively unreasonable. I understand the standard that we bear in terms of demonstrating substantive unreasonableness. We're asking the court to find that this is one of those exceptional cases wherein his sentence was shockingly high. And the shock emanates from the fact that he ended up with a 92-month sentence and his wife ended up serving a two weeks. So our precedent seems pretty clearly to hold that disparities between co-defendants do not on their own make a more severe sentence substantively unreasonable. What's your best response to that? Your Honor, every case is fact-specific. Obviously, there's the fact that it's within the guidelines, below the guidelines here. It's fact-specific. And it is a valid consideration. Obviously, there's a bunch of cases where the court ends up finding, well, that disparity is not going to be enough. We're not going to substitute our judgment. But there has to come a point where if you have two exactly similarly situated co-defendants, one ends up with eight years, 10 years, 15 years. And the other one ends up with zero years without an ability to rationally distinguish between those two. But why doesn't that mean that the sentence of the wife was unreasonably low? After all, she was sentenced after he was. The district court didn't have that sentence in front of it when it made the decision.  Which is why we're not arguing that there's procedural error because the judge couldn't predict what was going to end up happening. But this court is now able, post-sentencing of both of them, to sit and look at the two sentences received and is able to compare. Is it proper for it to be before us rather than going back and asking the district court to reconsider? I'm sorry, Your Honor? I mean, you've appealed it. And at that point, did anybody go and ask the district court to reconsider the second sentence? I was in counsel below, but I'm not aware of a motion for reconsideration based on the sentence that was subsequently received by wife. He has the ability, and obviously an avenue that exists is direct appeal, and so that's where we are. But procedurally, Your Honor, no, I'm not aware of him having asked, can we reconsider? He was able to make the arguments because there was a predictive probability that she was going to get a much lower sentence given the fact that the government was only arguing for 18 months for her. Wasn't there a finding by the judge who sentenced his wife that one of the reasons she got a lower sentence was her claim that she was coerced by the defendant to participate in this? I'm not sure I characterized it as a finding, but Judge Swain, in terms of explaining her rationale for going to a time-served sentence, certainly mentioned and included the fact that the dynamic between husband and wife included domestic violence and a question about how much he was responsible for involving her. Well, wouldn't that be a big reason that distinguishes the two sentences and makes them totally not comparable? If you have two people getting sentenced and one of them argues successfully to the court that sentences her that she should be sympathized with because she was in a toxic, abusive relationship with a co-defendant and that he was influencing her to do these evil deeds, wouldn't that be a valid reason for not finding the two sentences comparable? I don't read... Or the two situations comparable? So, yes. I don't read Judge Swain's opinion, sorry, statements on the record of sentencing as going that far. What I'm looking at in Judge Swain's sentencing proceeding of Ionella is the government representing that they're trying to argue that this is all because she's accompanied by the husband. This is really the husband's problem and so she's the innocent here. And the government ends up asserting, well, no, because they were seeking jail time for Ionella, she's not that innocent. She's not that innocent, but they're all arguing the same thing. The government is arguing for jail time but a lower sentence. No one's saying she was under such duress that she was innocent and should not have pleaded guilty and should not be sentenced to anything at all. That's not the government's position. That wasn't Judge Swain's position, was it? No. So they're arguing and Judge Swain concluded that she was entitled to considerable leniency because, among other things, of those facts. I agree, Your Honor, that Judge Swain ended up focusing in part on the domestic violent aspect and what role that may have played. What I see in terms of the domestic violence allegation vis-a-vis my client, especially during the period of release, was that they got into a physical altercation and she ended up suffering domestic violence. From our perspective, I've got an eight-year difference. I've got a client who himself is shocked, and it's not his decision, he's shocked by the differential between what he received and his wife received. So what is the law, though, that we write? I mean, you concede the fact that we have cases that say a differential is not enough. So how do we account for that precedent? What are the words we need to put on the paper to account for that precedent and help your client? What would the articulation of the law be? Your Honor, and if I misspoke, I apologize. Any difference between similarly situated co-defendants is not going to be enough to go ahead and reverse a sentence. But there comes a point where, and it's the shock standard, is this a big enough difference between similarly situated co-defendants? And that has two aspects to it. This panel's assessment of how similarly situated they actually are and what the differential was between the two. If you end up with relatively similarly situated but it's only a 12-month difference, you're not going to feel any shock. If you think it's 100% similar situated and you end up with an 8-, 10-, 12-, 15-year difference, then that's shock. And so your honors don't rubber stamp, you independently assess, and you determine whether there was a sufficient disparity between defendants to shock. I would say as a matter of law, if they're similar, then 8 years is per se shocking. You guys are never going to give us a per se rule. You shouldn't give us a per se rule. But I think just to make a suggestion perhaps, I don't know that we would be required to issue a rule on that. I think what you said before is certainly there's no standard that says disparity between co-defendants automatically means a sentence is unreasonable. But as you noted earlier, obviously all of the factors of the sentencing, including such disparity, can be considered. It's not off the table. We're not barred from considering that. My question, though, is if that's one of the things we can't consider, we could look at the full picture of the sentencing and say, well, there's this large disparity, and if we think that they're similarly situated, perhaps that gets us to the shocking of the conscience. My question is, though, what else is there here? Or maybe the question is, what suggests that they truly are similarly situated such that we should be shocked by this? And what suggests they're similarly situated, Your Honor, is that the government described it appropriately as a family affair, and that's the thread here. So I've actually – Well, that doesn't go, though, to what the roles are. I mean, just because, yes, they were all involved, it's a family affair. The family's involved, but different people in the family sometimes do different things.  And I point the court to Appendix A88, which is the government's argument in the sentencing of Ionella, which actually points to all the similarities between them. My guy's loss amount – Could you just tell us – Sorry. The loss amount is going to be the same for all the co-conspirators pretty much, unless one joined late or something like that. It was in here, Your Honor. Sorry. But what I'd like to know is what did they do that was the same? In other words, put the domestic abuse or coercion factor aside altogether. Tell me what evidence there is that shows that this is her role and it lines up exactly with what was his role. And I'm not going to get an exact correlation, Your Honor, I'm not, because my guy went ahead and – Sorry, Your Honor. In other words, eight years – I agree with you. We're not going to tell you eight years is never going to – is always going to be too much for people who are in some way similar. The question is how similar the people's situation versus how diverse the sentence. So tell me in what ways are they similar? Thank you, Your Honor. They, as indicated on page 88 of the appendix, they had similar connections to the higher-ups. They went and visited the engineer who was the one who went ahead and put together these skimming instruments. She was heard on the phone in terms of the wiretap discussing the mailing of packages, which was the primary culpability of my client, receipt of six packages over the course of two months. So she goes to the same people. She ends up being part of these packages, which have his address as opposed to hers, but it's still the same address. They end up living together. They indicate that she was situated in close proximity to some of the leaders in the organization. Again, my guy got hit in large part by Judge Stein by saying, well, you're close to the leaders in the organization. So I have all those, and I know you don't want to hear me say loss amount, but his loss amount was predicated on her stealing. And yes, there is one actually really fundamental difference. She stole $1.95 million, and he actually never put his hand in the till in terms of that. So I think the family affair, while of course that could mean a lot of things in a lot of contexts, here literally has these two folks doing this stuff together. The godfather usually doesn't put his finger in the box. There are other people who do that. Which was interesting in this organization, Your Honor, because the folks that Judge Stein found were the actual leaders did put their fingers in the box. That was kind of how it ran. So it's the upside down of what our typical image is of. All right. Thank you. And thank you for articulating my argument. You're welcome. Thank you. Good morning. My name is Seidler. I represent the appellant Limeratos. The first issue I would like to discuss, we've raised a whole host of guideline issues, and I'm not going to get into that. But the first issue I would like to discuss is the search of the premises. So it's 6 o'clock in the morning. A group of police officers, detectives, agents knocks on Limeratos' door, rings the bell. He comes to the door. They place him under arrest. There is conflicting testimony as to whether it took. There's conflicting testimonies, conflicting positions as to how long it took before he put his pants on and they hustled him out the front door, put him in a squad car, and took him off to jail. Well, part of the conflict, excuse me, it wasn't part of the conflict that he didn't agree, or at least in his affidavit, which was never cross-examined, he never took the stand. But in his affidavit, he said they came to the door, I came to the door, they arrested me, they put me in the car and omitted any pants putting on. And the pants putting on was learned from the accredited testimony of the agents that they took him upstairs to his room so that he could dress. That's correct. But it's not really dispositive here because the government, the judge, made an issue of crediting Agent Molloy in his testimony. But the most important part of Agent Molloy and his testimony and the evidence is that after Limeratos was removed from the house, Agent Molloy, in his affidavit, in support of a search warrant, stated that he didn't go into the garage. He didn't do a sweep, a look into that garage, until after Limeratos was taken out of the house. And that's on page four of the affidavit. So you can't say, well, this happened, this happened, and this happened, because Agent Molloy is telling the truth. But Agent Molloy, under oath, put in his papers when Limeratos was taken out of the house, it was at that point that I went into the garage. So what he did is Limeratos was taken out of the house at some point, whether before he had his pants on, with his pants. So your position then simply is that once he's out of the house in the car, there's no reason to do a security sweep at all, because the agents don't have to worry about somebody popping out of somewhere and shooting them while they're taking him upstairs to put his pants on. He's gone, they're gone, that should be the end of it. Right, and then they went into the garage, and then the electronics weren't in plain view. They were there, but they weren't in plain view. So they're poking around in the garage. Then they tell the wife, the two daughters, and the family dog to go up to the bedroom and wait, because we're going to go get a search warrant. And that's what happened. Limeratos was gone. There was no reason to go into the garage. The family was kept there not because they were suspects. They were kept there because they wanted to get a search warrant, and they didn't want anything removed from the house. But that's okay, it seems to me, and tell me if I'm wrong. I would think that's okay if they took them upstairs, and after a legitimate security sweep had identified potential evidence in the garage. It's not at all uncommon for agents to freeze a scene to go get a search warrant, to come back and get things that were—and even to do a more thorough search once they've identified evidence in plain sight during a legitimate security sweep. I mean the whole argument really turns on the idea, I think, that—and I'll be asking the government about this— that once he's in the car, all of the security stuff takes place after he's already safely in the police car and ready to go. Yes, sir. But the point I was trying to make about the wife and the daughters is they weren't targets here. They weren't suspects. There was no reason why a security sweep should have been conducted just because the wife and the daughters remained in the house. The target, Limberatos, was gone. At that point, they had no business going into the garage. And when they went to get a search warrant, it was only because of what they saw when they went into the garage. And the agent was clear in the affidavit. I went into the garage after he was arrested and removed from the house. And the other issue I would like to mention is that Limberatos pled guilty to counts one, two, and four. He didn't plead guilty to the count three, which was aggravated identity theft. And his reasoning was that the means of identification in this case was the bank card. Actually, it was a fraudulent or a copied bank card. It was not a means of identification identified by the statute. It was the number on the card, I thought. Yes, but... Well, why is the number on the card exactly what the statute covers? It covers account numbers, right? Yes, sir. And the first four digits, I understand, on the account, on the card, just identify the bank.  But that means 12 more digits. Yes, sir. Distinguish me from everybody else that uses the same bank. Yes, sir. Yeah. So why isn't that? I mean, putting aside whether that's enough, whether it makes a difference to that particular count that he didn't plead guilty to, how does that make a difference to the counts that he did plead guilty to? In other words... I understand. The answer is not so much. But in terms of acceptance of responsibility, he didn't plead guilty to aggravated identity theft because it wasn't enumerated. That type of instrument was not enumerated in the statute so as to trigger the aggravated identity theft. He pled guilty to everything else. He pled guilty to the more serious in terms of penalty charges. He just didn't do that for legal reasons. In his mind, legal reasons. Okay. So then when he goes for acceptance of responsibility, you know, it's thrown at him, well, you went to trial, you're not entitled. But the application, though, to acceptance of responsibility doesn't say just because you go to trial, you're not entitled to it. Didn't he go to trial on factual issues? I mean, that's what the jury was for, was for the factual issues. It wasn't just I made a motion to dismiss as a matter of law because my conduct, which would be proven to the jury, doesn't constitute the offense. He went to trial and contested all the elements of that offense. Yes, but he didn't deny any of the elements of the offense. Okay. When he went to trial, it was because the instrument did not meet the definition. All right. He didn't say that I didn't do it. He pled guilty to all the underlying offenses, which indicated that he did it. But on that matter, you know, it was thrown up to him that, you know, you went to trial and it doesn't apply because that's what the commentary says. But the actual guideline in the application, though, doesn't say that. Thank you. I think I've reserved two minutes. If I may. Yes, you have. Thank you, Mr. Seidler. Now we'll hear from Mr. Rothschild. May it please the court. My name is Sam Rothschild. I'm an assistant United States attorney in the Southern District of New York. I represent the United States in this appeal, and I represented the United States in the district court. This court should affirm the judgments against Limberatos and Konstantinescu. Let me start with the suppression motion. Mr. Seidler repeats the version of the facts as alleged in his client's affidavit. But as Detective Malloy testified during the suppression hearing and as Judge Stein credited, the protective sweep of the residence took place while Mr. Limberatos was in the foyer at the place of his arrest. So in other words, he opened the door, he was partially dressed, the agents entered, they placed him under arrest, and while he's standing there in the foyer, because they'd like to take him up to his room to get him dressed, that's when the protective sweep of the residence occurs. Detective Malloy stays with Mr. Limberatos in the foyer, so he is not personally the agent who goes into the adjoining room, which turns out to be the garage, and sees in plain view evidence of the crime, including a car and electronic devices, which were in fact in plain view. Detective Malloy remains with Mr. Limberatos in the foyer, and eventually once the protective sweep is concluded and they determine that it is safe for the agents to bring him upstairs to get dressed, Detective Malloy accompanies Mr. Limberatos upstairs, they get him dressed, they proceed to put him in a police car and he's taken away, and at that point they go and seek a search warrant based on what was observed in plain view. So Mr. Moshav, that's pretty much the impression I got from the briefs, but I sometimes miss things in the briefs. I missed, if it was there, any argument such as Mr. Seidler made here, that in the affidavit the same agent testified that he went into the garage after Mr. Limberatos was in the police car. Your Honor, I don't believe those words appear in the affidavit. It says after the arrest, is that what? I think that's right, Your Honor, and I think this was flushed out in more detail during the suppression hearing. I think what came out during the hearing is that Detective Malloy personally remained with the defendant in the foyer, and then it is true that I think subsequently Detective Malloy went to the area that had been swept because he was the affiant on the affidavit and confirmed what another officer had already relayed to him. So that's what the testimony was that Judge Stein credited, and to whatever extent there was an inconsistency with something that was said in the affidavit, and there may not have been, depending on what we see when we look at it, your position would be, well, that's just something that goes to the credibility determination that the district judge made. I think that's exactly right, Your Honor, and I'll note I don't believe this issue of what was in the affidavit even came up during the hearing. I don't believe that was an issue about which there was any testimony. This may be something that was forfeited, any argument that somehow the fact findings of the judge were inconsistent with the affidavit. I think that's right, and again, I think the government's position is there is no inconsistency. I'm happy to be heard on any of the other issues or to answer any questions. I'm interested in the restitution order. Yes, Your Honor. So you distinguish this restitution order from the one in Mortimer on the ground that the district court in that case required the defendant to follow the BOP's payment plan. Here the court said that the defendant may do so. What other options were available to Mr. Quantonescu? In other words, what are his other options to pay restitution if not through the inmate financial plan? Well, yes, but to not follow the BOP's payment plan. Well, I believe that the plan is there to assist the defendant in making restitution payments if, for instance, Mr. Quantonescu had the means. So how would he have made installment payments if it was not through the BOP program? So I think that he could have directed, given that he is in custody and presumably unable to access his bank account himself, could have directed somebody else to log into his bank account and make payments on his behalf directly to the government. I think it need not go through the BOP, but the program is there to facilitate his installment payments if he chooses to make use of that program. But we have held that improperly ordered restitution, including procedural defects in the order, constitute an illegal sentence and amount to plain error. What is your best response for why this particular restitution issue doesn't qualify? Yes, Your Honor. So I think the final three prongs of the plain error standard are not met here in the sense that, one, there's no direct precedent, I think, precluding what Judge Stein did here. And so I don't think it is a plain error. Two, even if you disagree with that, it's hard to see how this affects his substantial rights or calls into question the fairness of the judicial proceedings. If anything, the Judge Stein's finding that he's entitled to make installment payments, as opposed to requiring a lump sum payment, which I think Judge Stein could have imposed, inures to the defendant's benefit here. Well, but, of course, that all depends on whether there are assets that could be reached to make a lump sum payment or whether they even exist. In terms of the – I mean, I thought your principal argument is not just that there's no precedent saying it's error. You're arguing that it's not error at all because he was allowed to make payments through this if he chose. That's exactly right, Your Honor. Maybe I misunderstood the question. So is there no – well, can you just tell me how this was supposed to work for this defendant? In other words, he's ordered to make restitution of X dollars, and he's permitted to do that on the installment plan, right? That's right. And the installments start immediately. Is that right? That's right, Your Honor. He doesn't have a choice about that. He's supposed to make a payment the day he goes to prison or the day after he goes to prison, whatever it is. He has to pay an installment at some point, right? Monthly installments. And the money that he can access via this Bureau of Prisons plan, if he says I don't want that money touched, he's entitled to do that under this sentence? Your Honor, I think whether he's entitled to do that – I think to get to the court's question, I think the government would need to affirmatively seek relief under the order if we thought that he were doing something to skirt his restitution as well. So the Bureau of Prisons cannot just say, oh, we see you have a restitution order, and you're supposed to make an installment payment on this day, and so we're going to take money out of your prison account and pay it? My understanding is that is the effect of this order being permissive as opposed to mandatory. That they cannot do that. Correct. Right, unless the government either goes and gets a separate order from the court to require it, or he chooses to participate in that program. That's correct, Your Honor. And the money that is in question, is that money that gets sent to him from outside or earnings in the prison or both, I guess? Is that the answer? I actually don't know the answer to that question, Your Honor. Well, I know from having researched the program that it's at least money that he earns during the course of his sentence. Whether it also includes money that is sent to him, I don't know the answer to that. So there's nothing in this order that authorizes the Bureau of Prisons, without his consent, to take the money that he earns and apply it to the restitution order? Is that the government's position? The government's position is that it's by virtue of his participation in this program. I didn't understand that to be your argument. I thought you were saying that the reason it wasn't an impermissible delegation pursuant to Mortimer is because of the word may. Because they had the option. But he would argue he didn't really. And by failing to designate what the installment payments were, the BOP is the one setting it, and therefore that is the impermissible delegation. I agree with the first half of what Your Honor said, that our argument, I think, is dependent on the word may and this being permissive here. With respect to the second part of what Your Honor said, I'm not sure that they are making the argument that he didn't have another choice. I don't think that is the argument that they're making. Can you explain to me, please? Well, I haven't heard the other side to be arguing that he was somehow forced into participating in the inmate financial repayment plan. So you're saying that even though there wasn't a set of – isn't it collapsing on itself? Because the fact that they're not – the court didn't set the installment payments, right? You would agree with that, right? The court merely said he needed to make installment payments. Right. And so right now the only thing out there is the BOP. But, yes, there was the word may. So what you are asking us to find is that inserting the word may takes it outside of an impermissible delegation. That's correct, Your Honor, because the inmate could choose not to participate. And what happens if we decide that there's no other practical option, that this is effectively delegating it to the BOP? Well, I think in that case, Your Honor, you'd still have to overcome the plain error hurdle. And, again, I think especially in the third and fourth prongs of the analysis, it's difficult to see how that's reversible here. But even if it were, I think in that case what the court could do would be to remand solely on the issue of restitution. Again, I don't think that the court need do that here. Is there anything in the record that tells us how much was taken as an installment? I mean, what schedule was set by whoever set any schedule? There's nothing in the record to that effect, Your Honor. So the issue is really going to what the judge pronounced is objectionable or not objectionable. That's what I understand. And your position is that it's not objectionable because if there's anything funky about the way the BOP program operates, he always had the option of just saying, no, I'm not going to do that. And at that point, if he said, I choose not to, or it will be like, I would prefer not to participate in the BOP program, there is nothing that mandates either in the judge's order or as a matter of law that the Bureau of Prisons can take as much money as they think is appropriate out of his account or anything at all out of his account. Is that your position? Correct, Your Honor. Okay. Unless the court has further questions, we'd rest on our brief. Thank you very much. Thank you. Thank you, Your Honors. Obviously, the court is interested in the restitution issue, and I briefed it, so I just wanted to address that briefly. The distinction between may and shall doesn't hold any water, as far as I can see, because the court doesn't have an alternative installment amount. I mean, there's no other amount in there. It says shall make installment and may end up using the IFRP. But because the court doesn't say how much he would otherwise be giving, it appears that the only alternative he has is to go through an IFRP in order to be able to provide the installment. Well, excuse me. Why is that? If he has to make an installment payment, can he say, I hereby agree to pay one penny out of the prison fund, or I agree to pay $10 to be paid out of a checking account, and I authorize somebody to write a check for me on my behalf? Why is that? In other words, if he still has the option to say, I would rather not. Now, I don't know that that's true, but do you contest that, that under this order he could just say, no, thank you, I don't want to participate in the prison program and let it lie at that point? What happens then, in your view, and what does the record say about what happens then? I'll start with this, which is I would welcome a decision from this court saying that because it has this installment payment language, he can pay a penny and be able to satisfy the order. I mean, if that's the interpretation of the order. No, he could pay a penny first, and if the government doesn't like it, they can come after him and say, no, no, no, we meant like a serious installment payment, and judge, please tell him one penny isn't enough. He has to pay $500 a week, or he has to pay 10 percent of his prison earnings, or he has to pay some amount of money. And I can't, because it's not part of the record, and frankly I don't know the answer, I don't know what has been imposed on him. I don't know whether he's even participating in the IFRP. That's just the point. If we don't even know whether he's participating in this program at all, and the only question is that there's a case that says he can't be made to participate in that program, or if he is, that's problematic, what is left of the argument? There's nothing that says that if this is really at his discretion. The case actually doesn't stand for you shall participate in the program. The case stands for the court. It's their obligation to determine the amount of the installment. It's not enough to just say installments versus lump sum. It's then the court's obligation to determine the amount of the installment. Yeah, but excuse me. Sorry. It is an improper delegation if the court says you can pay on the installment plan up to the probation department to decide. That's the usual thing that used to happen before that was outlawed. Up to the probation department to set the amount, then that's an improper delegation. But if the court does not set an amount and does not delegate to anyone else the authority to set the amount, and he has an option of – I'll just put it up to the Bureau of Prisons. If that's his choice, then where is the problem? If he could choose to say I'm not going to let the Bureau of Prisons do this, then isn't it up to the government or him to go back to the court and say, well, what is his obligation here? How much does he have to pay? To whom and how? And as I stated at the outset, if in fact the installment order on the restitution order leaves it completely to my client's discretion in terms of how much he needs to pay and not participate in the IFRP, we are happy with the interpretation of the order as that is. Unfortunately, because I don't know what's happening in the real world, I would have a hard time understanding that that's a realistic option for him. Well, we don't know any of that because it's never happened. He didn't object. Did he object below to this may? No.  Plain error. If he had objected to this order below, then this all could have been thrashed out in the district court. We would have gotten somewhere. Instead, he didn't object to it. We don't even know what he did. We don't know that he did agree to participate in the program. Maybe feeling that's a real possibility. That could have happened, but it hasn't happened. I just don't see how we are in a position to decide that he has been prejudiced when no record at all has been made about what actually happened and no clarification has ever been asked or received from the district court about what the installments are supposed to be. My understanding, Your Honor, is that in this court's jurisprudence, in terms of looking at restitution orders, frankly, you will rarely, if ever, given the procedural posture, find out how that's ultimately been implemented. You look at what the court ended up ordering, and under Mortimer— Right, but what it ordered here is you have to pay in installments. If you choose, you can sign up for this prison program. That's all we know that happened. And I guess I'm still having trouble understanding why that is erroneous or why that's an impermissible delegation because nothing, it seems to me, has been delegated to anybody except your client, which is he may choose to participate in a program. As I understand that program, I don't think they look at what are his outside resources, and I don't think they look at what the total number of dollars of restitution is. That program means that X percent of your prison earnings gets siphoned off and sent to the government. But if he knows that's what they're going to do, and he chooses to participate in it, I have a little trouble seeing that as an external delegation. A defendant is entitled to make choices. I would have a lot of trouble with the argument that even the delegation to the probation department would be improper if the order took the form of the judge saying, well, I think you should pay in installments. And the defendant said, well, how much are the installments? And the judge said, gee, I'm not sure. What do you think? And the defense lawyer said, let the probation department worry about that. If that were affirmatively the option of the defendant rather than something that was the order of the court, there would be a waiver, not just a forfeiture, and there wouldn't even be a plain error review of that. Right, and so that isn't what the record shows, obviously, in terms of the transcript. And I guess maybe it's just based on experience with restitution orders. We see after you leave jail, you've got to pay X percent, and we're used to that. There's a dollar amount when the court defines what the installment payments are going to be. And it's the court's obligation to define the installment amount. And I, when I read it, and I think maybe Judge Perez as well read it, I don't read that as a zero or a penny dollar amount on an installment. I suppose that would be odd, but I guess I don't see what I don't see for after he gets out, putting aside what happens when he's in. I don't see anything that says the probation department picks the amount. No, no. Judge Stein did what one typically does. After you're out of jail, it's going to be 10 percent or 25, whatever it is. It's in there, sorry. So he defines that. And while you're in jail, if you choose, you can – so there's no obligation to pay anything, it seems to me, while he's in prison. Except the language, sorry, Your Honor, the language of the restitution order is while serving the term of imprisonment, you shall make installment payments. I don't think anybody's going to interpret that as a zero. The question that I am interested in is would we be creating – or how do we – there's a circuit split over the question about whether or not an impermissible delegation, like as a per se matter, affects substantial rights. There are some circuits that say that it does, and there are some circuits that say that they don't because it was an error to impermissibly delegate. Why would we find that here and why would we want to wade into it when we don't know to the extent to which your client is actually going to be affected because you haven't presented a proposal that's been rejected nor have you sought clarification by the district court? I think the important point for Your Honors is that you have Mortimer and it's a Second Circuit case and Mortimer says we're not going to send it to the IFRP. So there seems to be – at least there's potentially a disagreement among this panel about whether or not an impermissible delegation actually occurred with the word may. But let's assume for a second that there is. We then have to reach, as the colleague on the other side indicated, whether or not this meets the plain error standard. And we do have some cases, some circuit cases, suggesting that, of course, somebody's substantial rights are going to be affected when a restitution order has been impermissibly delegated. But we have other circuits that say there's not. My question would be why would we even want to wade into this circuit split when we don't actually know if something that would be amenable to your client has been presented to a district court for rejection or not. And because I can't cite rhyme and verse in terms of what facts were in front of those courts in terms of making a decision that this does rise to the level of plain error or not, it feels more structural to me in terms of the type of error, which is you're impermissibly delegating to probation. We determine – I mean structural is maybe an overstatement, but we're not going to dive too deeply into the development. Well, I mean it's actually not. Some of the circuits have called it a structural error. Right. And so that's the open door if your honors decide to go through it because, yes, I can't present to you whether he's paying more than he should be or less than he should be. I can't. Do you have any – I mean your client does have the ability to go back and seek clarification even now from the district court, right? Correct. Since this is a term of condition of supervised release. I take it you're appointed counsel here? I'm appointed counsel on appeal. Correct. And is your understanding that you would be compensated under the Criminal Justice Act if you went back and made such an application? Other than having to navigate getting admitted in the southern district, which they're happy to do, yes. Okay. Well, all right. Thank you. All right. Thank you very much. And Mr. Lachlan, you have something? Your honors, I would just urge, before you make a decision, to read the Malloy affidavit in support of the search warrant. Contrary to the government's position, he talks about – I'm actually having a hard time hearing you, sir. Contrary to the government's position, he states what he did and when he did it. Do you have that with you? Page 4 of the search warrant affidavit. And what was represented in the brief is that in that, Agent Malloy states that he entered the Limberatos garage after Limberatos was removed from the residence. Is there anything in his testimony – is the government misrepresenting his testimony where he says that, well, yeah, he did, but that had already been done by another agent during the security sweep, and he was just corroborating that? But that's not what he said in his affidavit. Well, that's all right. I mean, okay. It's not all right. But the suppression motion is made on – is decided on the basis of the evidence that was presented in the district court at the time of the suppression hearing, right? Yes, sir. But if there was no argument made that hinged on the affidavit, that's something we could go back and look, right, and see what happened at the suppression hearing. Yes, sir. Okay. Thank you very much. All right. Thank you. Thank you to all of you. We'll take the case under advisement.